ANDRES F. RIVERA, Plaintiff, *v.* ISBRANDTSEN Co., Defendant.

City Court of the City of New York, Trial Term, New York County, April 22, 1952.

*Charles Glatzer* for plaintiff.

*John T. Noonan* for defendant.

McGIVERN, J. This case concerns itself with the saga of the S. S. *Flying Arrow* in foreign waters. The action had its origin in the signing of shipping articles on October 29, 1949, by the plaintiff as an assistant electrician on the S. S. *Flying Arrow* for a voyage from the port of New York to the Far East via Mediterranean waters for a term not exceeding twelve months.

The first cause of action is for a breach of contract with reference to the shipping articles which called for $285.16 a month for the voyage, and the second cause of action is for an alleged assault and battery by the master of the vessel.

With reference to the first cause of action for breach of contract, it is alleged that on the 5th day of January 1950, while the ship was anchored off Hong Kong, the defendant caused the plaintiff to sign off without just cause and so occasioned the plaintiff's loss of wages for the balance of the voyage. According to the plaintiff, the skipper, in defiance of governmental warnings, plainly indicated that he contemplated a voyage from Hong Kong to Shanghai, the character of which voyage was beyond the scope of the plaintiff's agreement with the defendant because it would necessarily involve risks different from and in excess of those incidental to the employment of seamen engaged in an ordinary commercial voyage of a peaceful nature. History sustains the plaintiff's contention that at the time in question the waters of the Yangtze were in the control of the Chinese Nationalists, and blockaded against the entry of foreign ships, not excluding American flag vessels.

The evidence displays that prior to the plaintiff's signing off, Captain Jones of the *Flying Arrow* received the following warnings of United States Government origin:

(A) On December 16, 1949, at Okinawa, the United States Air Force, on behalf of the State Department delivered a message to the skipper, regarding conditions in and out of the port of Shanghai; in this message it was related that another Ameri-

can flag vessel, the *Sir John Franklin,* a short time previously, had been subjected to a barrage of fire in the lower estuary of the Yangtze River, damaging the vessel and endangering life aboard; the State Department further stated that the port of Shanghai constituted a zone of danger, to which risks American lives and property should not be exposed.

(B) Similar warnings were received while at Pusan, Korea, on December 20, 1949, and at Hong Kong, December 29, 1949.

(C) On December 31, 1949, the American Vice-Consul in Hong Kong delivered to the master a warning issued by the Department of State to the effect that the approaches to the Yangtze and Shanghai had been mined and that '' due to the manner in which the mines have been laid, no channel has been left open and that the only way to move vessels in and out would be to sweep the mines.''

(D) On January 3, 1950, the office of the American Consulate General, Hong Kong, delivered to the master a communication which in substance denied a request of the Isbrandtsen Line for a safe conduct assurance for the *Flying Arrow* to enter and exit Shanghai.

(E) On January 5, 1950, the American Vice-Consul in Hong Kong, informed Captain Jones that he deemed it advisable and was prepared to discharge such members of the crew who declared their unwillingness to sail into areas covered by the department's warnings.

Furthermore, it appears that the crew knew of the general conditions obtaining by virtue of radio broadcasts heard by the crew aboard the vessel; and it further appeared that the Hong Kong newspapers carried the ship's schedule which included Shanghai as a port of call; that cargo was taken aboard bound for Shanghai; the ship was cleared for Shanghai, and at no time did the captain ever in fact categorically deny he would take the vessel to Shanghai. In any event, on January 5, 1950, the plaintiff, along with ten others of the crew, under the aegis of the American Vice-Consul in Hong Kong, signed off, and accordingly, plaintiff seeks the balance of his contractual wages, to which the court deems him entitled on the ground that the plaintiff was justified in his belief that the captain would sail for Shanghai and that the crew was so led to believe; under the circumstances, it is a reasonable finding that the master would not have been justified in endangering the crew by taking the ship to Shanghai, in known defiance of a series of Government warnings.

The court notes with no small interest that Captain Jones stated in the course of his testimony that the warnings (*supra*) had no more effect on him than " weather bulletins ". This cavalier attitude is no doubt in the best intrepid traditions of the American merchant marine, but a court cannot reasonably view such daring as not fraught with a peril above and beyond the type of duty contemplated by the shipping articles. Nor does the court believe that the so-called bonus agreements imposed on the plaintiff any duty to embrace any perils other than those contemplated in the shipping articles.

In arriving at this conclusion in favor of the plaintiff, the court is guided by the rationale of the Appellate Division, first department, in the almost identical case of *Becker* v. *Isbrandtsen Co.* (279 App. Div. 638). It would also appear that the point at issue is not of novel impression in the law. Our attention has been called to *Caine* v. *Palace Steam Shipping Co.* ([1907] 1 K. B. 670) and also *Robson* v. *Sykes* ([1938] 2 All E. R. 612). Accordingly, the court awards the plaintiff the sum of $1,456.77, representing contractual damages arising out of his first cause of action.

This foregoing figure is based on a finding that the plaintiff made reasonable efforts to secure passage while in Hong Kong, and is arrived at as follows: wages from January 5, 1950, to April 12, 1950, the sum of $926.77; wage differential between April 12, 1950, the date of his departure from Hong Kong, to June 13, 1950, the loss of $80; the sum of $50 for transportation to New York City; subsistence at $4 per day for one hundred days, or $400 — total amount of judgment, $1,456.77.

Another facet of the plaintiff's first cause of action is his claim for penalties pursuant to section 596 of title 46 of the United States Code. This section in effect provides that the payment of a seaman's wages must be made within four days after his discharge, and if the owner or master of the vessel refuses " without sufficient cause " to make such payment, then payment must be made to the seaman of a sum equal to two days' pay for each day during which payment is delayed.

The plaintiff herein predicates his claim pursuant to the foregoing statute on the fact that at the time of the signing off ceremony at Hong Kong on January 5, 1950, only basic wages then due were paid, but not the accrued bonus and overtime payments. It is admitted that these sums were in fact subsequently paid upon the arrival of the plaintiff in New York on or about July 14, 1950. The defendant company resists this claim on the ground that (a) the sums in question

did not constitute wages under the statute and (b) the captain acted with "sufficient cause". The court sustains the company as to the action of the captain, and in view of this it is not necessary to find definitively that the sums at issue were wages under the statute.

Even assuming *arguendo* that these sums in question are properly regarded as wages, the court is persuaded that viewed against the critical background of the signing off episode in the office of the Consul in Hong Kong, it would be unreasonable to hold the captain guilty of "arbitrary", "high-handed", "capricious", or "unconscionable" conduct in not paying these bonus and overtime demands at that time. The foregoing adjectives within the quotation marks are test words prescribed by the precedents and more particularly by Norris, The Law of Seamen (Vol. 1, ch. XVII). It is to be noted in the captain's favor that at the time, the question was raised in the presence of Mr. Hill, the Vice-Consul, and he opined that under the terms of the articles and the rules, as he knew them, there need be no settlement of the overtime and bonus question at that time. Indeed this seems to have been generally acquiesced in by all present; at any event it did not appear to have set off any great hue and cry. This opinion of the Vice-Consul afforded the captain some color of right in his decision to pay only basic wages to the departing seamen, and this action viewed against the stress of the moment cannot be called arbitrary or unreasonable. It is worthy of note that the captain did not question the plaintiff's rights, he merely indicated that the final settlement must be deferred to the company in New York. No palpable injustice was done, nor was there evinced any intent to abuse the seaman contrary to the statutory purpose, by withholding money due him. In fact, the plaintiff received the bonus and overtime payments due him upon presenting himself at the defendant's office in New York; and accordingly, under all the circumstances, the plaintiff's attempt to impose additional penalties herein is not warranted, and is hereby dismissed. The rejection of this claim is but in accord with the words of Judge LEARNED HAND in the case of *Petterson* v. *United States* (274 F. 1000, 1003 [U. S. Dist. Ct., S. D. N. Y., 1921]): "Still they [seamen] remain in some measure persons *sui juris,* and there is neither justice nor policy in aiding them to catch at penalties, where they have suffered no wrongs."

Coming now to the alleged assault by the master, according to the plaintiff, although only a member of the engine room crew, the "Black Gang", on the morning of January 5th, about

9:00 A. M., he bravely knocked on the door of the captain's cabin and having been bidden to enter, he directly asked the skipper if he intended to set sail for Shanghai. The skipper replied in a manner that hallows the memory of the immortal Captain Bligh: he stood up and delivered himself of a roundhouse that felled the plaintiff in his tracks. And more. He then proceeded to kick the plaintiff out into the companionway as though he were a stranger cur, and then slammed shut the bulkhead door. Thus did Captain Jones reply.

For corroboration, the plaintiff summoned the purser who was in the cabin at the time of the fracas. In the purser's own choice English, the captain gave the plaintiff '' a fore-arm slash '', and then with the aid of his feet spurned him over the threshhold. All this the captain denied. He didn't even lay a finger on him quoth he. All he did was to gently flick off the fellow's cap because he had entered his quarters without knocking and stood before him covered. In respectfully disbelieving the captain, the court is grieved to the soul. But, the circumstances being as they were, the probabilities are overwhelming that the master replied to the plaintiff's question with such vigor that the plaintiff's second cause of action is deemed proved by a fair preponderance of the credible evidence. However, it is difficult to regard the injury from the fisticuff as extensive; immediately after the encounter the plaintiff packed his gear, disembarked and signed off at the office of the Consul; since he was thus able to carry on, the court awards only the sum of $200 for this grievance.

Accordingly, there is awarded to the plaintiff the sum of $1,456.77 by way of a judgment against the defendant for the relief asked for in the first cause of action, together with interest from January 5, 1950, and the sum of $200 for the assault and battery as alleged in the second cause of action. All motions upon which decision was reserved and which are not disposed of by the foregoing are hereby denied. There will be ten days' stay of execution and there may be thirty days to make a case on appeal.